# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Prospect Medical Holdings, Inc., | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | Nos. 89 & 93 C.D. 2024 |
| | : | |
| Andrew Son (Workers' Compensation | : | |
| Appeal Board), | : | |
| Respondent | : | Submitted: June 3, 2025 |

BEFORE:   HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE MATTHEW S. WOLF, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                                         FILED:  August 26, 2025

Prospect Medical Holdings, Inc. (Employer) petitions this Court for review of two January 3, 2024 orders of the Workers' Compensation Appeal Board (Board), which affirmed a decision by Workers' Compensation Judge (WCJ) Timothy Bulman directing Employer to pay wage loss benefits to Andrew Son (Claimant). Employer argues that Claimant failed to present unequivocal, competent medical testimony, and that WCJ Bulman capriciously disregarded the unrefuted testimony of Employer's own medical expert that Claimant was fully recovered from his work injuries.  Because WCJ Bulman's factual findings are supported by substantial, competent evidence of record, we affirm the Board.

## I.  Background

At the heart of these consolidated cases are two work injuries sustained by Claimant on October 21, 2021, and November 15, 2021.  *See* Reproduced Record

(R.R.) at 19a. Employer filed Notices of Temporary Compensation Payable (NTCP) immediately following the incidents, each of which converted by operation of law to a medical-only Notice of Compensation Payable (NCP).[1] Claimant filed separate Claim Petitions in connection with those injuries on February 10, 2022; a Penalty Petition followed on February 15, 2022.[2] *Id.* at 6a, 11a. Employer filed timely answers to both Claim Petitions denying the material allegations. *Id.* at 300a. Because the Workers' Compensation Bureau assigned different dispute numbers to the claims, WCJ Bulman and the Board issued separate, though identical, decisions, in response to which Employer filed separate Petitions for Review. For clarity and ease of disposition, this Court here issues a single opinion on both matters.

After the petitions were assigned to WCJ Bulman, Claimant offered his own fact testimony as well as the expert testimony of Dr. Sagi Kuznits, his treating physician. In its defense, Employer offered the expert testimony of Dr. Howard Levin, who performed an independent medical evaluation (IME) of Claimant on July 26, 2022.

### A. Claimant's Evidence

At an April 7, 2022 deposition, Claimant testified that he was hired by Employer in September 2021 as a school social worker for the Delaware County Intermediate Unit, an alternative school for children with learning and behavioral disorders. R.R. at 22a. Claimant was working at the time for Malvern Community Health Services (Malvern), where he continued to be employed, albeit with reduced

---

[1] Section 406.1(d)(6) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, added by Section 3 of the Act of February 8, 1972, P.L. 25, 77 P.S. § 717.1(d)6), provides that an employer who does not provide notice of a discontinuance of medical payments within 90 days of issuing an NTCP "shall be deemed to have admitted liability and the [NTCP] shall be converted to a[n NCP]."

[2] The Penalty Petition is listed as Item No. 5 in the Certified Record of the matter docketed at 93 C.D. 2024 (concerning the November 15, 2021 injury).

2

hours, after beginning his work for Employer. *Id*. at 24a. In his new position working for Employer, Claimant was tasked with leading group therapy sessions and individual client meetings. *Id*. at 24a-25a. Claimant also was responsible for accompanying some youths between classrooms in order to ensure their safety. *Id*. at 26a. Because altercations sometimes occurred between the students he was accompanying and other students, Claimant found it often necessary to draw on his training in crisis prevention. *Id*. at 27a.

On October 21, 2021, Claimant was accompanying a student to his office when another student emerged from another classroom, jumped on Claimant's back, and pushed him down from behind. R.R. at 29a. Though Claimant did not fall to the ground, the incident left him with pain in his neck and his head behind the left ear. *Id*. at 30a. Claimant alerted his supervisor, who instructed him to call Employer's workers' compensation claims manager for a telehealth evaluation. *Id*. Following a physician's prescription, Claimant began taking a muscle relaxant and receiving physical therapy. *Id*. at 31a.

Claimant was assaulted again by a student on November 15, 2021. R.R. at 33a. While walking down a hallway, Claimant recalled, he was punched in the back of his neck behind the right ear. *Id*. at 34a. Claimant experienced an "extreme headache" above his left eye and in the front of his forehead the next morning, for which he visited an emergency room. *Id*. at 34a, 39a. Additionally, Claimant noticed a loss of executive function and short-term memory, which he recognized as concussion symptoms. *Id*. at 34a.

In the following months, Claimant experienced frequent forgetfulness, mistakes while writing, and two fender benders that he attributed to a loss of driving skills. R.R. at 36a. Claimant began receiving treatment from Patricia Minardi, a

3

physician's assistant in Dr. Kuznits's office. *Id.* at 38a. Ms. Minardi drafted a note detailing work restrictions, which Claimant then shared with his supervisors. *Id.* at 41a. In response, Claimant was transferred to a community health facility that he described as "a safer place to work." *Id.* at 39a. The new position was salaried and paid better than the previous one. *Id.* at 40a. However, Claimant was among many employees who were laid off by Employer on February 2, 2022, as part of a corporate restructuring. *Id.* at 61a.

At a November 10, 2022 hearing before WCJ Bulman, Claimant reported that he had not returned to work since being laid off. R.R. at 265a. Claimant also testified that he continued to experience headaches, neck pain, and memory loss, though he did acknowledge some improvement since his last testimony. *Id.* at 268a-69a. One area in which Claimant continued to encounter difficulty was in communicating for periods longer than 20 or 25 minutes, for which he sought the help of a speech therapist. *Id.* at 270a-71a. Nonetheless, Claimant believed that he could return to work in some capacity. *Id.* at 290a.

Testifying at an August 4, 2022 deposition, Dr. Kuznits stated that he was board-certified in neurosurgery. R.R. at 89a. Dr. Kuznits recalled that a physician's assistant in his office first treated Claimant on December 2, 2021, when Claimant presented with headaches in his left frontal region, dizziness, vertigo, and aversions to light and sound. *Id.* at 94a. At the time of Dr. Kuznits's testimony, Claimant continued to experience difficulty with reading, slowed reaction times, difficulty with concentration, fatigue, sudden mood changes, and difficulty with driving. *Id.* at 94a-95a.

Dr. Kuznits first treated Claimant personally on April 28, 2022. R.R. at 102a. Before the examination, Dr. Kuznits reviewed Claimant's medical records, including

4

a November 16, 2021 computed tomography (CT) scan that showed no sign of brain bleeding or other abnormalities. *Id.* at 102a-03a. Dr. Kuznits explained that concussions are seldom detectable through CT scans, since "the damage is typically at the cellular level." *Id.* at 103a. During the examination, Dr. Kuznits observed "some cognitive difficulty, long-term concentration[,] and reading abilities." *Id.* However, Dr. Kuznits also acknowledged that the examination revealed no "cranial deficit" or loss of function in claimant's language, memory, or fundamental knowledge. *Id.* at 104a. A physical examination similarly revealed "equal and symmetric" reflexes, a steady gait, no tenderness to palpation, and a full range of motion. *Id.*

Ultimately, Dr. Kuznits concluded that Claimant sustained a cervical sprain and strain in the October 21, 2021 injury, while the November 15, 2021 incident "definitely" resulted in a concussion. R.R. at 125a-26a. Dr. Kuznits opined that the strain and sprain was "resolved" at the time of his April 28, 2022 examination of Claimant, but that Claimant also has "significant difficulty with cognitive work" as a result of the concussion. *Id.* at 64a. However, Dr. Kuznits also acknowledged the possibility that, since the April 28, 2022 examination, Claimant may have "improved and [become] able to do some work." *Id.* at 63a-64a. Concerning prognosis, Dr. Kuznits explained that 90 percent of concussion victims recover within a year, but that several risk factors present in Claimant's case, including a previous concussion and a history of clinical depression, can result in prolonged symptoms. *Id.* at 147a. Dr. Kuznits also acknowledged that Claimant had been diagnosed with bipolar disorder years before the work injuries, for which Claimant had been taking Lamictal, an anticonvulsant. *Id.* at 133a. While Dr. Kuznits did not believe that the

5

Lamictal played a role in Claimant's persistent symptoms, he characterized the bipolar disorder itself as "a risk factor." *Id.*

Further discussing the subject of Claimant's fitness for work, Dr. Kuznits opined that Claimant was physically incapable of continuing in his pre-injury job as a school social worker for Employer or at Malvern. R.R. at 128a. Dr. Kuznits cited several reasons for continued restrictions on Claimant's work, including persistent headaches, "psychological issues," and difficulties with driving and viewing electronic screens. *Id.* However, Dr. Kuznits admitted confusion about the circumstances under which Claimant stopped working on February 2, 2022, acknowledging that he was unaware of any "specific event" and that he did not ask Claimant what had caused him to leave work. *Id.* It was Dr. Kuznits's "assumption" that Claimant's condition "just got worse and worse." *Id.* "I'll have to make a presumption," Dr. Kuznits elaborated, "that he was doing all the other therapies and he noticed how much deficit he had and just realized that he just could not do what he had to do and needed time to recover." *Id.* at 140a-41a. Dr. Kuznits clarified that he did not believe Claimant's concussion symptoms worsened but thought that Claimant got "frustrated" and "depressed" by his condition. *Id.* at 141a-42a.

**B. Employer's Evidence**

Testifying at an October 11, 2022 deposition, Dr. Levin stated that he was board-certified in neurology. R.R. at 180a. In preparation for the July 26, 2022 IME, Dr. Levin reviewed Claimant's medical history and took from Claimant a detailed account of the incidents of October 21, 2021, and November 15, 2021. *Id.* at 187a-88a. During their discussion, Dr. Levin also learned that Claimant was diagnosed with ADHD and bipolar disorder in 2004, for which Claimant was taking Lamictal, a prescription medication. *Id.* at 190a. During the neurologic portion of

6

the exam, Dr. Levin found no cognitive impairment, no problems with vision or eye movements, and no difficulty with balance. *Id.* at 191a-92a.

Following the examination, Dr. Levin continued to review Claimant's medical records, including notes from his November 16, 2021 emergency room visit. *Id.* at 193a. Dr. Levin found that, other than "headaches and some neck pain," Claimant exhibited none of the symptoms that are normally indicative of a concussion, such as dizziness, lightheadedness, visual changes, nausea, vomiting, or blurred vision. *Id.* That Claimant visited the emergency room on the day after the November 15, 2021 injury strengthened Dr. Levin's opinion, since the delay would have given concussion symptoms additional time to manifest themselves. *Id.* at 194a. Notes from Claimant's several visits to the physician's assistant in Dr. Kuznits's office likewise indicated nothing abnormal, according to Dr. Levin. *Id.* at 196a.

Based on the IME, his interview with Claimant, and his review of the medical records, Dr. Levin concluded that Claimant "may have suffered a head injury," but that there was no "evidence of anything else." *Id.* at 203a. It was "not clear from the records" that Claimant sustained a concussion, in Dr. Levin's opinion, and the course of Claimant's medical treatment following the November 15, 2021 incident was similarly inconsistent with the treatment required by concussion victims. *Id.* Dr. Levin did not believe that Claimant required any further additional treatment and expressed bafflement as to why Claimant continued to visit a physical therapist. *Id.* at 205a. Additionally, Dr. Levin found Claimant's bipolar disorder and ADHD significant, as it raised the "question" of whether those disorders were the cause of his continued symptoms rather than any purported concussion sustained on November 15, 2021. *Id.* at 198a. Dr. Levin further noted that Dr. Kuznits's notes

did not indicate a discussion with Claimant of his Lamictal prescription. *Id.* at 197a-98a.

### C. WCJ Bulman's Decision

In a March 2, 2023 order, WCJ Bulman granted both Claim Petitions on the ground that Claimant sustained a cervical strain and sprain in the October 21, 2021 incident, and a "concussion with a postconcussion syndrome" resulting from the November 15, 2021 incident. Employer's Br., App. B. (WCJ Decision), Order. WCJ Bulman further determined that Claimant was disabled by those injuries "as of February 2, 2022[,] and ongoing, the date [when] Claimant was laid off with physical restrictions." *Id.*, Finding of Fact (F.F.) No. 13. Although WCJ Bulman found Claimant to be fully recovered from the cervical sprain and strain, he determined that Claimant also continued to be disabled due to the concussion. *Id.*, F.F. No. 14. Finally, WCJ Bulman denied the Penalty Petition, explaining that Employer engaged in a reasonable contest and that any violations of the Act or its regulations were merely technical. *Id.*, F.F. Nos. 20, 23.

WCJ Bulman calculated the award of wage loss benefits as follows. For the period beginning on November 15, 2021, until February 1, 2022, Employer was directed to pay partial disability benefits to the extent that Claimant's combined earnings from both Employer and Malvern had declined from his (combined) average weekly wage (AWW) of $1,272.75. WCJ Decision, F.F. No. 16. For the period beginning February 2, 2022 and ongoing, Employer was directed to pay Claimant two thirds of his AWW, or $848.50 weekly. *Id.*, F.F. No. 16.

Concerning the witnesses' testimony, WCJ Bulman found Claimant credible on the basis of his demeanor and comportment, which he described as "candid, forthright and nonevasive." WCJ Decision, F.F. No. 8. WCJ Bulman also noted

that Claimant's subjective descriptions of his symptoms were consistent with credible medical evidence in the case. *Id.* As for the medical experts, WCJ Bulman credited Dr. Kuznits's testimony over Dr. Levin's, noting that Dr. Kuznits's office treated Claimant on several occasions (though, WCJ Bulman acknowledged, not Dr. Kuznits himself). *Id.*, F.F. No. 9. WCJ Bulman also found that Dr. Kuznits's opinions were based on "information contained within medical records of other practitioners." *Id.* In conclusion, WCJ Bulman found Dr. Kuznits's testimony to be "closely reasoned, logical and sequential[,] and supported by other credible medical evidence." *Id.*

Employer appealed to the Board, which affirmed. *See* Employer's Br., App. A. This appeal followed.[3]

## II. Discussion

In workers' compensation, the term "disability" means a loss of earning power. *Zuchelli v. Workers' Comp. Appeal Bd. (Ind. Univ. of Pa.)*, 35 A.3d 801, 804 (Pa. Cmwlth. 2011). When a work injury has occurred, the employer has the option of issuing a medical-only NCP, whereby it acknowledges a work injury and agrees to pay for medical expenses but does not accept liability for or agree to pay any wage loss benefits due to disability. *Ingrassia v. Workers' Comp. Appeal Bd. (United Health Servs., Inc.)*, 126 A.3d 394, 401 (Pa. Cmwlth. 2015). When an employee believes that he is "entitled to compensation because the injury has resolved into a disability," causing loss of earning power, he must file a claim petition. *Orenich v. Workers' Comp. Appeal Bd. (Geisinger Wyoming Valley Med.*

---

[3] Our standard of review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. *Lehigh Specialty Melting, Inc. v. Workers' Comp. Appeal Bd. (Bosco)*, 260 A.3d 1053, 1058 n.3 (Pa. Cmwlth. 2021).

*Ctr.)*, 863 A.2d 165, 170 (Pa. Cmwlth. 2004). The claimant bears the burden of proving that he sustained a work injury that resulted in disability, i.e., a loss of earning power. *Ingrassia*, 126 A.3d at 402.

On appeal, Employer presents three arguments for our consideration. First, Employer argues that WCJ Bulman's conclusions rely on Dr. Kuznits's "erroneous and admittedly speculative assumption[] that Claimant stopped working due to the work injury rather than an incidental company-wide layoff." Employer's Br. at 17. Second, Employer argues that Dr. Kuznits's testimony was incompetent and equivocal, and is therefore reviewable *de novo* on appeal. Third, Employer argues that WCJ Bulman capriciously disregarded Employer's evidence "that Claimant had fully recovered from the November 15, 2021 head injury as of July 26, 2022," the date of the IME by Dr. Levin.

## A. Claimant's Burden of Proof

As our Supreme Court has observed, "[i]n assessing the relevant burdens in a claim proceeding, [WCJs] must apprehend the stage to which proceedings have advanced." *Vista Int'l Hotel v. Workers' Comp. Appeal Bd. (Daniels)*, 742 A.2d 649, 658 n.11 (Pa. 1999). At the suspension stage—that is, when a claimant has returned to a pre-injury job with restrictions, and is subsequently laid off and petitions for a reinstatement of benefits—the claimant is entitled to a presumption that his loss of earning power is causally related to the work injury. *Teledyne McKay v. Workmen's Comp. Appeal Bd. (Osmolinski)*, 688 A.2d 259, 262 (Pa. Cmwlth. 1997). By contrast, the claimant is not entitled to such a presumption when an employer has granted a medical-only NCP and the claimant is subsequently laid off for economic reasons, because the loss of earning capacity has not yet been established. *See Ingrassia*, 126 A.3d at 401 n.10 (rejecting "the claimant's argument

10

that his case should be treated as a request for reinstatement" when wage loss benefits have not been awarded, "because there was no established loss of earning capacity").

Here, Employer argues that "Claimant continued working normal duty until his job was eliminated as part of a 300-employee layoff," and that there was "no competent evidence to support an award of total disability." Employer's Br. at 16-17. Dr. Kuznits failed to give unequivocal medical testimony that Claimant's loss of earnings was injury-related, in Employer's view, and even admitted his ignorance that Claimant was laid off; "the only thing that changed as of February 2, 2022," Claimant's last day of work, "was the structure of Employer's company and the need for hundreds of excess administrative staff, which incidentally included Claimant." *Id.* at 20. Employer reasons that Dr. Kuznits's mere conjecture of a medical reason for Claimant's termination failed to satisfy Claimant's "never-shifting burden of proof . . . to show a work-related loss of earning capacity." *Id.* at 21. WCJ Bulman could only have reached his conclusion by "applying the burden of proof applicable to reinstatement petitions, which presumes disability any time the [c]laimant's earning power decreases after a return to work with restrictions (i.e.[,] a suspension)." *Id.* at 21-22.

Employer relies on *Ingrassia* in support of the proposition that the "claimant bears the burden of proving every element of the claim, including disability, *even where the injury was acknowledged by a [medical-only NCP]*." Employer's Br. at 19 (citing 126 A.3d at 402). In *Ingrassia*, an employer filed a medical-only NCP acknowledging a claimant medical van driver's injury in a collision, and a panel physician released the claimant back to work on the following day. 126 A.3d at 397. Claimant filed a claim petition alleging total disability as of the day following the

11

collision and presented medical testimony that he could not continue his regular job because driving worsened his symptoms. *Id.* at 398. A WCJ did not credit the claimant's medical expert's testimony, however, and denied the claim petition; the Board affirmed. *Id.* at 400. On appeal to this Court, the claimant maintained that the WCJ and Board applied the wrong burden of proof, as his purported wage loss benefits should be treated "as though they are in a suspension status" due to the medical-only NCP. *Id.* We disagreed, reasoning that, "because [the c]laimant did not establish a loss of earning capacity from the work injury accepted by [the e]mployer, there were no disability benefits to suspend or to reinstate." *Id.* at 402. Since the claimant "properly filed a claim petition," he had "the burden of proving a disabling work injury by competent medical evidence." *Id.*

While we agree with Employer that *Ingrassia* supports the proposition that Claimant bore the burden of proof before WCJ Bulman in this case, we disagree that *Ingrassia* provides a legitimate basis for overturning the decisions below. We see no indication that WCJ Bulman applied the wrong burden of proof or granted Claimant the presumption normally reserved for claimants seeking reinstatement of disability benefits. Rather, as WCJ Bulman explained, Dr. Kuznits's credited testimony was that Claimant was incapable of returning to his pre-injury job as a school social worker for Employer or to his job at Malvern. *See* WCJ Decision, F.F. Nos. 8-9. *Ingrassia* is inapposite because the claimant in that case failed to satisfy his burden before the WCJ, and appears only to have changed tack on appeal to the argument that a more forbearing burden of proof was warranted.

For the above reasons, we further observe that Employer's focus on February 2, 2022, is misplaced. While WCJ Bulman's statement that "Claimant became disabled due to the work injuries as of February 2, 2022[,] and ongoing" could have

12

been more artfully phrased, we see it as a clear reference to the fact that Employer could no longer provide Claimant with modified-duty work at the community health center as of that date. *Id.*, F.F. No. 13. Since Claimant was found to be incapable of returning to full duty for Employer or to his job at Malvern, WCJ Bulman reasonably concluded that Claimant sustained a loss of earning power on February 2, 2022, as a result of the November 15, 2021 injury.[4]

## B. Dr. Kuznits's Testimony

Next, Employer argues that Dr. Kuznits's estimony was both incompetent and equivocal, as it is "based on erroneous factual assumption[s] and fail[s] to account for Claimant's pre-existing and non-work-related bipolar disorder and ADHD." Employer's Br. at 25. In support, Employer points to Dr. Levin's testimony that several of the symptoms exhibited by Claimant, such as the inability to focus, are "widely known" to be "commonly associated with ADHD." *Id.* at 25-26. Dr. Levin also "testified that he did not believe Claimant sustained a concussion," Employer observes, yet WCJ Bulman summarily declared that Claimant's ongoing symptoms are not related to his pre-existing conditions. *Id.* at 26. Employer maintains that Dr. Kuznits's testimony is rendered "even further incompetent by his erroneous assumptions regarding Claimant's ability to work following the injury [that] allegedly resulted in a concussion." *Id.* Since the competency of medical testimony is "a question of law fully reviewable on appeal and is distinct from the question of credibility," Employer asks this Court to reverse the decisions below. *Id.* at 24

---

[4] Such a loss of earning power is in addition to any reduction in hours that Claimant may have already undergone while performing modified-duty work between November 2021 and February 2022, which WCJ Bulman included in his award of disability benefits. *See* WCJ Decision, F.F. No. 16.

13

(citing *Boring v. Workmen's Comp. Appeal Bd. (Combustion Eng'g, Inc)*, 629 A.2d 287, 289 (Pa. Cmwlth. 1993)).

On this count, Employer's arguments are, again, unpersuasive. Dr. Kuznits freely acknowledged Claimant's pre-existing mental conditions and offered his unequivocal opinion that those conditions could worsen and prolong Claimant's symptoms. Thus, we see no basis for the assertion that Dr. Kuznits was ignorant of those conditions or failed to account for them. Furthermore, as we explained in the previous subsection, Dr. Kuznits's uncertainty as to the circumstances behind Claimant's February 2, 2022 dismissal is of no moment, because Claimant did not claim an injury on that day; rather, he is only alleged to have sustained a loss of earning power from the elimination of his modified-duty position. While Dr. Kuznits was, by his own admission, ill-informed of the circumstances behind Claimant's dismissal, such a defect does not render his testimony equivocal or incompetent. It is well settled that we review a medical expert's testimony "as a whole and may not base our analysis on a few words taken out of context." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). Thus, while we agree with Employer that questions of a medical expert's competency are fully within our purview, we see no basis for ruling Dr. Kuznits's testimony to be incompetent or equivocal.

Employer's remaining objections to Dr. Kuznits's testimony amount to little more than an expression of disagreement with WCJ Bulman's factual findings. We have consistently held that, when both parties submit evidence, "it does not matter if there is evidence that supports a contrary finding; the only question is whether there is evidence that supports the findings that were made." *Griffis v. Workers' Comp. Appeal Bd. (Albert Einstein Healthcare Network)*, 327 A.3d 694, 708 (Pa.

14

Cmwlth. 2020). WCJ Bulman carefully explained that, among other reasons, he credited Dr. Kuznits's testimony over Dr. Levin's because Claimant had received treatment in Dr. Kuznits's office "on multiple occasions as opposed to a single evaluation by Dr. Levin." WCJ Decision, F.F. No. 9. A WCJ acts within his discretion when he ascribes more weight to a treating physician than to a physician "who examines simply to testify for litigation purposes." *D.P. "Herk" Zimmerman, Jr. v. Workmen's Comp. Appeal Bd. (Himes)*, 519 A.2d 1077, 1080 (Pa. Cmwlth. 1987). Since Employer's unfavorable comparison of Dr. Kuznits's testimony to Dr. Levin's is essentially a critique of WCJ Bulman's credibility determinations, it gives us no reason to disturb the decisions below.

### C. Employer's Evidence of Full Recovery

Lastly, Employer argues that WCJ Bulman capriciously disregarded its "unrefuted medical evidence that Claimant had fully recovered from the November 15, 2021 head injury as of July 26, 2022," the date of the IME by Dr. Levin. Employer's Br. at 28. In the context of workers' compensation law, this Court has defined capricious disregard of evidence as "a deliberate and baseless disregard of apparently trustworthy evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 144 (Pa. Cmwlth. 2004). Employer maintains that it presented "the full recovery opinion of Dr. Levin in support of its assertion that Claimant had fully recovered" at the time of the IME, supported by Dr. Levin's observations that Claimant was "totally intact neurologically," "was not taking any medications for his headaches aside from Tylenol," and showed "no cognitive impairment, vision problems, issues with eye movements, or balance problems." Employer's Br. at 29.

15

Once again, Employer is essentially asking this Court to overturn WCJ Bulman's credibility determinations, which is not our role. While our case law does permit us to overturn those determinations in some circumstances, we have held it to be "a rare instance in which an appellate court would disturb an adjudication based upon the capricious disregard of material, competent evidence," so long as "there is substantial evidence to support an agency's findings." *Williams*, 862 A.2d at 144. In this case, WCJ Bulman credited Dr. Kuznits's competent, unequivocal testimony that Claimant's postconcussion symptoms prevented a return to full-duty work. Since WCJ Bulman's conclusions are supported by substantial evidence, we disagree that his determinations constitute a capricious disregard of Employer's competing evidence.

### III. Conclusion

It is well settled that "[q]uestions of credibility and the resolution of conflicting testimony are . . . within the exclusive province of the WCJ and are not subject to appellate review." *Joy Global, Inc. v. Workers' Comp. Appeal Bd. (Hogue)*, 876 A.2d 1098, 1103 (Pa. Cmwlth. 2005). Because Dr. Kuznits's testimony was both competent and equivocal, and because WCJ Bulman's credibility determinations were carefully explained in his factual findings, we see no reason to disturb those determinations on appeal. Accordingly, we affirm the Board.

 

_____
MATTHEW S. WOLF, Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Prospect Medical Holdings, Inc., : **CASES CONSOLIDATED**
Petitioner :
:
v. : Nos.  89 & 93 C.D. 2024
:
Andrew Son (Workers' Compensation :
Appeal Board), :
Respondent :

# **O R D E R**

AND NOW, this 26th day of August 2025, the orders of the Workers' Compensation Appeal Board in the above-captioned matters, dated January 3, 2024, are hereby AFFIRMED.

_____
MATTHEW S. WOLF, Judge